Elayna J. Youchah, Bar No. 5837
youchahe@jacksonlewis.com
Peter Navarro, Bar No. 10187
peter.navarro@jacksonlewis.com
**JACKSON LEWIS P.C.**
3800 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada  89169
Tel:  (702) 921-2460
Fax: (702) 921-2461

*Attorneys for Defendant*
*Trump Ruffin Tower I, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

MARKUS LEVERT and OMAR UNATING,
on behalf of themselves and all others
similarly situated,

        Plaintiff,

      vs.

TRUMP RUFFIN TOWER I, LLC, d/b/a
Trump International Hotel Las Vegas; and
DOES 1 through 50, inclusive,

        Defendants.

Case No.:  2:14-cv-01009-RCJ-CWH

# DEFENDANT TRUMP RUFFIN TOWER I, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CIRCULATION OF NOTICE PURSUANT TO 29 U.S.C. § 216(b)

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

DEFENDANT'S OPPOSITION AND SUMMARY OF ARGUMENT ............................... 2

INTRODUCTION ............................................................................................................ 3

PROCEDURAL HISTORY .............................................................................................. 4

STATEMENT OF FACTS ................................................................................................ 5

I.      TIHLV's Operations And Relevant Policies And Practices ................................ 5

        A.      Timekeeping ........................................................................................... 5

                1.      Timekeeping Policies And Practices ............................................ 5

                2.      Timekeeping And Door/Security Data .......................................... 6

        B.      Uniform Policies And Practices ............................................................... 8

                1.      TIHLV Has No Policy That Requires Employees To Change Into
                        Or Out Of Their Uniforms On Hotel Property .............................. 8

                2.      Plaintiffs' Evidence Does Not Reflect TIHLV's Uniform Policy ..... 10

        C.      Banking Policies And Practices .............................................................. 11

        D.      Bartending Policies And Practices .......................................................... 13

II.     Named Plaintiffs' And Opt-In Plaintiffs' Employment At TIHLV ...................... 14

LEGAL ANALYSIS ...................................................................................................... 15

I.      Plaintiffs Fail To Meet Their Burden To Demonstrate That They Are Similarly
        Situated To Any Class They Seek To Represent ............................................... 15

        A.      Plaintiffs Are Not Similarly Situated To The Three Classes Identified
                In Plaintiffs' Complaint ......................................................................... 16

                1.      Plaintiffs Have Not Met Their Burden Regarding Their
                        Alleged Uniform Class .............................................................. 17

                2.      Plaintiffs Cannot Meet Their Burden In Light Of TIHLV's
                        Overwhelming Evidence ............................................................ 19

B.      Plaintiffs Are Not Similarly Situated To Classes Of Which They Are Not Members ..................................................................................................20

II.     Named Plaintiffs' Attempt To Amend Their First Amended Complaint Must Be Rejected ...............................................................................................................21

        A.      Named Plaintiffs' Cannot Seek Certification Of Classes Not Predicated On Facts Or Claims Articulated In Plaintiffs' First Amended Complaint.....................21

        B.      Plaintiffs Attempt To Allege Facts That Constitute An Entirely New Legal Theory ......................................................................................................23

III.    Tolling Is Inappropriate In This Case .....................................................................23

IV.     If Plaintiffs' Motion Is Granted, The Proposed Notice Must Be Amended .............................24

CONCLUSION..................................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

*Adair v. Wisconsin Bell, Inc.,*
   No. 08-C-280, 2008 U.S. Dist. LEXIS 68942 (E.D. Wis. Sept. 11, 2008)............................18, 19

*Alvarez-Machain v. United States*, 107 F.3d 696 (9th Cir. 1997) ..........................................................23

*Bean v. Crocker National Bank*, 600 F.2d 754 (9th Cir. 1979) ..............................................................20

*Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129 (D. Nev. 1999)....................................................24

*Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914 (D. Ariz. 2010) ....................................................................15

*Costello v. Chertoff*, 258 F.R.D. 600 (C.D. Cal. 2009)............................................................................21

*Cranney v. Carriage Services, Inc.*, 559 F. Supp. 2d 1106 (D. Nev. 2008) ...........................................24

*D'Anna v. M/A-COM*, 903 F. Supp. 889 (D. Md. 1995) ..........................................................................16

*Edwards v. City of Long Beach*, 467 F. Supp. 2d 986 (C.D. Cal. 2006) .................................................16

*Freeman v. Walmart Stores, Inc.*, 256 F. Supp. 2d 941 (W.D. Ark. 2003) .............................................18

*H & R Block, Ltd. v. Housden*, 186 F.R.D. 399 (E.D. Tex. 1999)............................................................16

*Heastie v. Community Bank of Greater Peoria*,
   125 F.R.D. 669 (N.D. Ill. 1989)..........................................................................................................21

*Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249 (S.D.N.Y. 1997) ..................................................................15

*Leuthold v. Destination America, Inc.*, 224 F.R.D. 462 (N.D. Cal. 2004) .............................................15

*Lewis v. Nevada Property I, LLC*
   No. 12-cv-01564, 2013 U.S. Dist. LEXIS 8945 (D. Nev. Jan. 22, 2013)...........................................16

*Lewis v. Nevada Property 1, LLC,*
   No. 12-cv-01564, 2014 U.S. Dist. LEXIS 49068 (D. Nev. Apr. 8, 2014).....................................21, 23

*Lusardi v. Lechner*, 855 F.2d 1062 (3d Cir. 1988) ..................................................................................15

*Reed v. Mobile County School System*, 246 F. Supp. 2d 1227 (S.D. Ala. 2003)...............................15, 21

*Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264 (D. Minn. 1991) ....................................................16

*Sheffield v. Orius Corp.*, 211 F.R.D. 411 (D. Or. 2002)..........................................................................16

*Shushan v. University of Colorado*, 132 F.R.D. 263 (D. Col. 1990))......................................................20

*Sperling v. Hoffman-La Roche Inc.*, 118 F.R.D. 392 (D. N.J. 1988).......................................................15

*Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001)........................................15

*Thompson v. Speedway Superamerica LLC*,
     No. 08-CV-1107, 2009 U.S. Dist. LEXIS 3816 (D. Minn. Jan. 20, 2009)................................16

*Young v. Beard*,
     No. 11-cv-02491, 2014 U.S. Dist. LEXIS 2216 (E.D. Cal. Jan. 8, 2014) ................................22

**STATUTES**

29 U.S.C. § 216........................................................................................................................................2, 4

29 U.S.C. § 255...........................................................................................................................................5

**DEFENDANT'S OPPOSITION AND SUMMARY OF ARGUMENT**

Defendant Trump Ruffin Tower I, LLC dba Trump International Hotel Las Vegas ("TIHLV" or "Defendant"), by and through its counsel of record, submits this Opposition To Plaintiffs' Motion For Circulation of Notice Pursuant to 29 U.S.C. § 216(b) ("Plaintiffs' Motion").

Plaintiffs' Motion fails to demonstrate that Plaintiffs are similarly situated to purported class members even under the lenient evidentiary standard required for conditional certification and approval of notice applied by the courts at this initial stage because (1) Plaintiffs have proffered no evidence of any company-wide policy or practice that requires or permits employees to perform work off the clock in violation of the Fair Labor Standards Act ("FLSA") in any of the myriad ways Plaintiffs allege; (2) Named Plaintiffs are not and were not members of three newly devised classes for which they seek certification and therefore clearly are not similarly situated to the classes they seek to represent; and (3) three of the six classes Plaintiffs seek to certify are not predicated on claims alleged in Plaintiffs' First Amended Complaint ("FAC" or "Complaint").

This Opposition is based upon the below Memorandum of Points and Authorities, the attached exhibits, all pleadings and documents on file with the Court, and any argument that the Court deems proper.

Dated this 20th day of October, 2014.

JACKSON LEWIS P.C.

_____/s/ Elayna J. Youchah_____
Elayna J. Youchah, Bar No. 5837
Peter Navarro, Bar No. 10187
3800 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

*Attorneys for Defendant Trump Ruffin Tower I, LLC*
*dba Trump International Hotel Las Vegas*

2

1

## INTRODUCTION

Plaintiffs' strategy for litigating this case appears to be: "allege now, verify later."  In the four months between when Plaintiffs first filed their law suit and when they moved this Court for certification, Plaintiffs' claims have been a moving target.  Plaintiffs have added certain FLSA allegations, removed all of their state-law claims, invented new classes (of which they are not members) for claims that do not appear in any version of their complaints, and fail to identify classes for allegations that *do* appear in their Complaint.  Despite their various iterations and attempts, Plaintiffs simply cannot demonstrate that they are similarly situated to any of the classes they seek to represent.  Plaintiffs fail to provide competent evidence that demonstrates that TIHLV maintains any company-wide or even class-wide policy or practice that requires or permits employees to work off the clock.

Plaintiffs cannot meet their burden to demonstrate that they are similarly situated to *any* of the six different classes they seek to represent.  First, the only evidence Plaintiffs have proffered in support of their contention that TIHLV maintained a policy requiring employees to change into their uniforms on property, is a Guest Services Associate Manual that—on its face—never applied to bartenders like Levert or Unating.  Second, Plaintiffs' assertion that they worked off the clock for approximately two hours per day is belied by TIHLV's employee and manager declarations and timekeeping and entry/exit data.  Indeed, evidence indicates that Plaintiffs typically spend less than five minutes on property before they clock in and less than five minutes on property before they clock out.  As such, an individualized inquiry into each employee's claims will be necessary.  Third, Named Plaintiffs seek to represent three classes in which they, themselves, do not belong.  Named Plaintiffs—who worked as bartenders—are not similarly situated to Front Desk employees, Audit employees, or Valet employees and cannot represent those classes.  Finally, Plaintiffs improperly attempt to amend their Complaint by identifying three entirely new classes and alleging never-before articulated causes of action in their Motion.

For all of these reasons, Plaintiffs' Motion For Notice must be denied in its entirety.

# PROCEDURAL HISTORY

Named Plaintiffs, Levert and Unating, are former employees of TIHLV.  Levert worked as a bartender from March 7, 2008 to February 21, 2013.  *See* Doc. 19-6,[1] Levert Decl. ¶ 4; Peterson (Director of Human Resources) Decl. ¶ 6, attached as Ex. 1.  Unating worked as a bartender and busser from June 22, 2012 to November 4, 2013.  *See* Doc. 19-3, Unating Decl. ¶ 4; Peterson Decl. ¶ 6.

Levert and Unating filed this case on May 9, 2014 in the District Court of Clark County Nevada alleging wage and hour violations under both the Fair Labor Standards Act ("FLSA") and Nevada state law.  On June 23, 2014, TIHLV removed the case to this Court.  *See* Doc. 1.  On July 21, 2014, Plaintiffs filed their First Amended Complaint, which did not contain Counts 3, 4, or 5 of the original complaint that alleged certain Nevada state-law claims.  *See* Doc. 9.

Named Plaintiffs now move this Court for an order to circulate notice to nearly 1,700 employees pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).  Plaintiffs allege that TIHLV:

(1)     required Plaintiffs to perform numerous work activities before clocking in and after clocking out, but did not compensate Plaintiffs for this work;

(2)     required Plaintiffs to wear company uniforms, maintained a company-wide policy that all uniforms must stay on property, and required all employees provided with a uniform to be in proper uniform before clocking in and must clock out before changing out of their uniform;

(3)     required Plaintiffs, who were responsible for handling money transactions, to retrieve and deposit cash money from an "employee bank" before and after their shift, when Plaintiffs were off the clock;

(4)     required Plaintiffs to pick up keys and set up their bar when Plaintiffs were off the clock; and

(5)     routinely deprived Plaintiffs of a full uninterrupted 30-minute unpaid meal period.

---

[1]     TIHLV identifies each document by its corresponding ECF docket number the first instance TIHLV references the document in this Opposition.

Doc. 9 at 3:13-4:27.  Plaintiffs contend that the alleged off-the-clock work violated the minimum wage and overtime provisions of the FLSA.  *Id*. at 7:26-10:10.[2]

## STATEMENT OF FACTS

**I.     TIHLV's Operations And Relevant Policies And Practices**

TIHLV is a 64-story luxury resort hotel located at the edge of the Las Vegas Strip.  TIHLV currently employs more than 600 hourly employees who work in 77 different job titles and in 26 departments throughout the property.  *See* Peterson Decl. ¶ 3.  More than 1,700 hourly employees work or have worked at TIHLV since May 9, 2011.[3]  *See id*. at ¶ 4.

**A.     Timekeeping**

**1.     Timekeeping Policies And Practices**

TIHLV's timekeeping policy is clear and unequivocal.  "The Hotel must keep accurate records of the time worked by each associate.  Therefore, non-exempt associates are required to 'clock-in' and 'clock-out' when they begin their shift each day and when they complete a shift."  TIHLV 2010 Associate Handbook, attached as Ex. 2, at 16.  TIHLV rigorously enforces this policy.  *See* Garnica Decl. ¶ 11 (the hotel "absolutely prohibits me from working off the clock"); LeBlue Decl. ¶ 8 ("The hotel is pretty tedious in terms of record keeping."); Macadangdang Decl. ¶ 11 ("the hotel is strict about [clocking in before work]"); Sullivan Decl. ¶ 10 ("We can't work until we clock in.  My supervisors enforce these rules strictly.").[4]  "It is the policy of TIHLV to pay non-exempt associates overtime in accordance with federal, state, and local regulations."  *See* TIHLV 2010 Associate Handbook at 27.

TIHLV rounds time clock punches in 15-minute increments.  Peterson Decl. ¶ 19.  Thus, if an employee clocks in at 7:55 a.m., the clock will round the start time to 8:00 a.m.  *Id*.  If an employee clocks in at 7:52 a.m., the clock will round the start time to 7:45 a.m.  *Id*.

---

[2]      Plaintiffs' minimum wage allegations are subject to TIHLV's Motion To Dismiss.  *See* Doc. 15.
[3]      Generally, the statute of limitations for FLSA claims is two years.  *See* 29 U.S.C. § 255(a).  If a plaintiff can prove that an employer's violation was willful, the statute allows for a three-year limitations period.  *See id*.  May 9, 2011 represents the absolute earliest date relevant to Plaintiffs' claims.  TIHLV takes the position that there is no evidence, and therefore Plaintiffs cannot prove, that TIHLV wilfully violated the FLSA.
[4]      Declarations of 91 current and former employees who are potential class members of the various classes proposed by Plaintiffs are attached as Exhibit 3.

When reporting for work, it is TIHLV's policy that employees enter the hotel through the employee entrance, located at the rear of the hotel on the first floor.  *See* Peterson Decl. ¶ 17.  Employees must swipe their employee badge on a card reader to unlock the entrance door.  *See id*.  Sometimes, when more than one employee arrives at the door at the same time, one employee will swipe a badge and then allow the other employees to enter.  *See* Peterson Decl. ¶ 17; Gavilanes (Manager of Information Technology) Decl. ¶ 9, attached as Ex. 4.  After entering the building, but before beginning work, employees punch into the time clock using a biometric fingerprint reader, typing their associate identification number, or swiping their badge at one of several time clocks in the hotel.  *See* Peterson Decl. ¶ 18; Gavilanes Decl. ¶ 6.  There are two time clocks outside the employee changing room, within a few yards of the employee entrance.  *See* Gavilanes Decl. ¶ 3.  There are also time clocks in the hall behind the front desk, on the mezzanine level outside the hotel Finance office, and on the seventh floor pool level.  *See id.*

Although the employee-entrance badge reader is not used for timekeeping purposes, both the entrance badge readers and the time clock badge readers are maintained on the same network and therefore have synchronized clocks.  *See* Gavilanes Decl. ¶ 4.  TIHLV maintains the data generated when employees swipe their badges upon entering and exiting the property.[5]  *See id.*

## 2.    Timekeeping And Door/Security Data

Sample entrance/exit and time-punch data from the two Named Plaintiffs and three of the four declarants[6] demonstrate that purported class members spent a varying amount of time on property both before they clocked in for their shift and after they clocked out of their shift.  TIHLV compared the time at which an employee first entered the hotel on each day during a specific time period to the time at which the employee clocked in to start their shift.  *See* Ex. 5, Sample Swipe Analysis,[7] attached as Ex. 5; Gavilanes Decl. ¶ 7.  TIHLV compared the time at which the employee clocked out at the end of his

---

[5]     Since February 2012, TIHLV has used Workforce Access.  *See* Gavilanes Decl. ¶ 5.  Before February 2012, TIHLV used Gatekeeper.  *See id.* Gatekeeper experienced a database error and historical data could not be recovered because it was no longer supported by the vendor.  *See id.*

[6]     There is no time clock data for Plaintiff Deketelaere because she was classified as an exempt manager and, as such, did not record her work time using a time clock.  *See* Peterson Decl. ¶ 9.

[7]     If requested, TIHLV will produce the data underlying this report to the Court.

or her shift with the time that the employee last exited the hotel.  *See id*.  Out of the 323 sample instances for which both entrance/exit and time clock data is available[8] regarding Levert, Unating, Hill, Johnson, and Layug, there were 213 instances where less than 4 minutes elapsed between either the time they entered the hotel and clocked in to begin their shift or the time they clocked out at the end of their shift and exited the hotel.  *See id*.; Summary of Sample Swipe Analysis, attached as Ex. 6.  However, although this sample data demonstrates that all five of these Plaintiffs usually spent a very brief period of time on the property before their shift began or after their shift ended, there are significant variances among the five Plaintiffs.

For example, Hill and Unating entered and exited within 4 minutes of clocking in or clocking out more than 84% of the time while Layug did so only 24% of the time.  *See* Summary of Sample Swipe Analysis.  Between September 2, 2012 and September 29, 2012, during 14 out of 16 shift starts,[9] Janet Hill clocked in for her shift within one minute after entering the building.  *See* Summary of Sample Swipe Analysis.  At most, Hill spent eight minutes on property before she clocked in to begin her shift.  *See* Sample Swipe Analysis, Sept. 15, 2012 entries.  By contrast, in the same period Layug's data reflects instances in which he entered the building up to 51 minutes[10] before he clocked in to begin his shift.  *See id*., Sept. 11, 2012 entries.

Further, the data demonstrates that the time even the two Named Plaintiffs spent on property but not "on the clock" varied significantly.  From September 2, 2012 through September 29, 2012, the data for Named-Plaintiff Unating shows that the time between when he entered the hotel and the time he clocked in typically was one minute or less.  *See* Sample Swipe Analysis, Sept. 5, 8, 16, 23 (zero minutes); Sept. 2, 3, 4, 9, 11, 12, 15, 17, 18, 19, 24, 25 entries (one minute).  At most, Unating had an eight-minute gap between the time he entered the hotel and when he clocked in.  *See* Sample Swipe

---

[8]   This refers to the 323 sample instances where *both* entrance and clock in data are available or *both* clock out and exit data are available.  In some instances, there is no data regarding the employee's entrance or exit because, for example, employees do not swipe their badge because they enter or exit with other employees or security opens the door for the employee.  *See* Gavilanes Decl. ¶ 9.

[9]   Refers to the 16 shift starts in which *both* data sets are available.  *See* n. 8.

[10]   Because Layug worked overnight shifts, instances in which there is no data related to badge swipes upon entering the building at the beginning of his shift or exiting the building at the end of his shift result in irregular results that do not accurately reflect the time elapsed.

Analysis, Sept. 22, 2012 entry.  By contrast, the data for Named-Plaintiff Levert shows that the time between when he entered the hotel and the time he clocked in varied significantly but the time between when he clocked out and when he exited the hotel was more consistent.  *See* Sample Swipe Analysis, 13 entrance/punch-in combinations range from one to 47 minutes but 15 out of 16 sample punch-out/exit combinations reflect that Levert exited the building within 2 minutes of punching out.[11]

### B.     Uniform Policies And Practices

The vast majority of TIHLV's public-facing employees wear company-issued uniforms during their shifts.  *See* Peterson Decl. ¶ 20; *see also* Employee Declarations (only 15 out of 91 do not wear uniforms).  TIHLV requires employees be in full uniform and ready to work when they clock in for their shifts.  *See* Peterson Decl. ¶ 21; Baudreau (Vice President and Managing Director) Decl. ¶ 3, attached as Ex. 7.  TIHLV offers to launder employees' uniforms free of charge if employees choose to drop soiled uniforms off in the wardrobe department.  *See* Peterson Decl. ¶ 22; Baudreau Decl. ¶ 4.  Employees, however, are not required to use the hotel laundry service.  *See* Peterson Decl. ¶ 22; Baudreau Decl. ¶ 4.  Logistically, the hotel simply does not have sufficient space for all employees to change on property or to store the uniforms for its approximately 600 non-exempt, uniformed employees.  *See* Peterson Decl. ¶ 23; Baudreau Decl. ¶ 5.

#### 1.     TIHLV Has No Policy That Requires Employees To Change Into Or Out Of Their Uniforms On Hotel Property

TIHLV does not have—and has not had—a policy or practice of requiring employees to change into their uniforms on property.  *See* Peterson Decl. ¶ 24; Baudreau Decl. ¶ 6.  Declarations from 76 potential uniform class members demonstrate that TIHLV does not have a company-wide policy or practice requiring employees to change their uniforms on property.  None of the 76 declarants who wear uniforms stated that TIHLV's policy required employees to leave their uniform on property or to change on the property.  *See e.g.*, Employee Declarations.  Forty-five of the uniform-wearing declarants always

---

[11]     Additionally, employees arrive early or leave late for a variety of individual reasons.  *See e.g.*, Chacon Decl. ¶ 8 (sometimes arrives before her shift and spends time in EDR [Employee Dining Room] eating breakfast); Hernandez Decl. ¶ 10 (usually arrives 10-15 minutes before he needs to clock in, will talk to his friends and have some breakfast); Klippert ¶ 9 (after arriving at work, but before clocking in, spends time fixing her hair); Macias ¶ 29 (sometimes arrives to work early because he goes to the gym); Muscari ¶ 29 (often arrives early and hangs out in the EDR and watches TV).

or usually dress at home and wear their uniform to work.  *See id.*   Sixty-three of the uniform-wearing declarants wear their uniform to or from work for at least some of their shifts or wear parts of their uniform to all of their shifts. [12]  *See, e.g.*, Magda Ortega Decl. ¶ 11 ("I typically put my pants and shirt on before I come to work and then grab my vest and tie and put them on at the hotel before my shift.").

Many employees have the hotel launder their uniforms for them but, because employees have multiple sets of uniforms, they still change into their uniform at home.  *See* Aguilar Decl. ¶¶ 17, 19; Aragon Decl. ¶ 9; Chavez Decl. ¶¶ 19, 20, 22; Cueto Decl. ¶¶ 27, 28; Cyr Decl. ¶¶ 8; Garcia-Samper Decl. ¶¶ 10; C. Johnson Decl. ¶¶ 20, 21, 22; Luc Decl. ¶¶ 9; Nichols Decl. ¶¶ 27, 28; J. Ortega Decl. ¶¶ 11; Qustandi Decl. ¶¶ 25, 26, 28; Roosendaal Decl. ¶¶ 10; Vinmans Decl. ¶¶ 20, 22. Indeed, one employee noted: "I am even provided a travel bag [for my uniform] so it seems that it is encouraged." Luc Decl. ¶ 9.

Of the 28 declarations from managers[13] who supervise employees who wear uniforms, not one manager stated that there is any policy requiring employees to change on property or that they instructed employees to only change on property.  *See, e.g.*, Abbitt Decl. ¶¶ 17-18; Aldridge Decl. ¶¶ 6, 9, 10, 11; Cheun Decl. ¶¶ 4, 7, 8, 9; Cooper Decl. ¶¶ 4, 7, 8, 9, 10; Gutierrez Decl. ¶¶ 4, 7, 8, 9; Kennedy Decl. ¶ 9; Manthey Decl. ¶¶ 4, 8, 9, 10, 11; Paul Decl. ¶¶ 4, 7, 8, 9, 10; Provinciali Decl. ¶¶ 27, 31, 32, 33; Ruppert Decl. ¶¶ 4, 7,8, 9; Stanton Decl. ¶¶ 10-12.

---

[12]      The 63 uniform-wearing declarants who wear their uniforms to or from work include bartenders (*see e.g.*, Almanza Decl. ¶ 20, 22; Farias Decl. ¶ 21; Travis Decl. ¶ 19), valets (*see e.g.*, Gallardo Decl. ¶ 24, 26; Dunagen Decl. ¶ 13; LeBlue Decl. ¶ 26, 28; Manipon Decl. ¶ 29, 30; Oesterle Decl. ¶ 25, 27; Thompson Decl. ¶ 21), and front desk agents (*see e.g.*, Cueto Decl. ¶ 25, 27; Grant Decl. ¶ 14, 15; Lawson Decl. ¶ 19, 21).

[13]      Declarations of 32 individuals who are or were managers of potential class members of the various classes proposed by Plaintiffs are attached as Exhibit 8.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 2.    Plaintiffs' Evidence Does Not Reflect TIHLV's Uniform Policy

In support of Plaintiffs' Motion, Levert and Unating each submit what they assert to be "a true and correct copy" of TIHLV's Guest Services Associate Manual.  *See* Unating Decl. ¶ 8, Ex. B; Levert Decl. ¶ 8, Ex. B.  Plaintiffs' Motion references the manual to assert that "Trump's Operating Standard 1.3.13 requires that, 'All uniforms must stay on property.'"  *See* Pls.' Mot. 7:3-5.

Even on its face, the Guest Services Associate Manual does not, did not, and would not apply to Named Plaintiffs because neither Levert nor Unating ever worked in the Guest Services department.  *See* Kennedy (Former Guest Services Manager) Decl. ¶¶ 7, 8, attached as Ex. 9.  The Guest Services department employs valets, doorpersons, and bell persons.  *See id.* ¶ 3.  As bartenders, Plaintiffs Levert and Unating worked in the Food & Beverage department.  *See* Peterson Decl. ¶ 6.  Plaintiffs Levert and Unating do not assert that they worked as Guest Services Associates or that the Guest Services Associate Manual applied to their employment.  *See generally* Levert Decl.; Unating Decl.  Further, the manual submitted by Plaintiffs appears to be neither true nor correct insofar as it:  is missing pages (*e.g.*, 12, 15, 18, 20), is oddly formatted (*see, e.g.*, 17), and includes—what appears to be—segments of a five-year-old Associate Handbook (missing pages 10, 11, and beyond 34).  More importantly, the Guest Services Manager for TIHLV at the time Plaintiffs allege that this manual was published never published or promulgated the document submitted by Plaintiffs.  *See* Kennedy Decl. ¶ 5.  Likewise, the Vice President and Managing Director for TIHLV at the time this manual was supposedly published or promulgated, did not distribute this document to Plaintiffs or anyone else.  *See* Baudreau Decl. ¶¶ 7-9.  Further, to this day, the Guest Services Associate Manual proffered by Named Plaintiffs is not in effect for the Guest Services department.  *See* Peterson Decl. ¶ 25.

Indeed, on July 3, 2010, when Marti Kennedy was Guest Services Manager, she issued a memorandum to valet employees regarding new shirts issued by TIHLV.  In the memorandum, Kennedy specifically stated that "[w]e recommend that you take them home to wash since we cannot guarantee that when you turn them in for laundry service that you will have them available to wear for your next

1  shift." *See* Kennedy Dec. ¶ 9; July 3, 2010 Memorandum to Valets announcing new shirts, attached as

2  Ex. 10.

3       **C.     Banking Policies And Practices**

4       Five groups of employees use cash drawers or "banks" to perform their duties at TIHLV:  Front

5  Office Agents, Bartenders, Gift Shop Attendants, In-Room Dining Agents, and Managers.  *See* Wang

6  (Assistant Director of Finance) Decl. ¶ 4, attached as Ex. 11.  For individuals within these positions,

7  TIHLV assigns each employee their own bank with a pre-determined amount of money.

8       Each personal bank is stored in a personal locker near the employee entrance.  *See* Wang Decl.

9  ¶ 5.  The employee needs to use two keys to open the bank locker:  one key is unique to the employee's

10 locker is kept by the employee and the second, universal key, is typically hanging from a wall in the

11 bank locker area.  When a banking employee arrives, he or she clocks in, picks up the second key, and

12 retrieves the black zipper "bank" pouch from his or her assigned locker.  *See* Barton Decl. ¶ 19;

13 Pasquale Decl. ¶ 26; Wang Decl. ¶ 9.  The employee then reports to his or her work station with the

14 bank.  *See* Wang Decl. ¶ 9.  The employee leaves his or her workstation approximately 15-30 minutes

15 before his or her shift is scheduled to end to count his or her bank, fill out paperwork, and deposit

16 documents or money with the hotel.  *See* Barton Decl. ¶ 21 (20-30 minutes); Cueto Decl. ¶ 32 (about 20

17 minutes); Grant Decl. ¶ 19 (15 minutes); Lawson Decl. ¶ 25 (15 minutes); *see also* Wang Decl. ¶¶ 10-

18 14.  After the employee verifies the amount of cash on hand, the employee collects the credit card

19 receipts, shift-end report, and other documentation and places it in an envelope to be deposited in a

20 deposit box or with the cashier in the cage.  *See* Wang Decl. ¶ 11.  If the employee has extra money in

21 his or her bank, he or she puts the money into an envelope, labels the envelope, fills out the "drop sheet"

22 (which is typically countersigned by a witness), and deposits the envelope into a deposit box.  *See* Wang

23 Decl. ¶ 12.

24      The cashier office, often referred to as "the cage," is a small room behind the deposit box drop

25 area and is open Monday through Friday 9:30-10:30 a.m. and 3:30-4:30 p.m.  During this time, the

26 cashier counts and verifies the money that employees deposit overnight and throughout the day.  *See*

27

28

Wang Decl. ¶ 7.  Employees also visit the cage to obtain change during open hours or to reconcile their "due backs."  *Id.*  An employee incurs a due back if, at the end of his or her shift, the employee's bank is below their pre-determined bank amount due to processing a refund or tipping out employees.  *Id.* ¶ 8.

Because the hotel operates 24 hours per day, 7 days per week, employees who work shifts that do not coincide with the cage hours obtain change from their manager and can "sell" their due backs to their manager so that their bank remains at the required amount.  *See* Wang Decl. ¶ 13.  The manager then processes the purchased due backs with the cage at a later time when the cashier is available.  *Id.*  Indeed, because the cage is only open two out of 24 hours each day, most employees perform their banking duties when the cage is closed.  *Id.* ¶ 15.

Employees are required to perform all of these banking duties on the clock.  All 11 declarants who carry a bank state that they have never performed their banking duties off the clock.  *See* Almanza Decl. ¶ 27, 32; Barton Decl. ¶ 19, 22; Cueto Decl. ¶ 33; Farias Decl. ¶ 24, 25; Grant Decl. ¶ 17, 18; Lawson Decl. ¶ 26; Pasquale Decl. ¶ 20, 21; Salgado Decl. ¶ 28; Stills Decl. ¶ 30, 36, 38; Tarwoe Decl. ¶ 30, 33; Travis Decl. ¶ 22, 23.  Declarant Taylor Grant, for instance, explained that he left approximately 15 minutes at the end of his shift to finish his banking duties and has never banked off the clock.  *See* Grant Decl. ¶ 19.  He further explained that even if his banking duties take more than 15 minutes and exceed his scheduled shift, he knows that he is still required to finish his banking duties before clocking out.  *See id.*  Each of the 13 managers who supervise employees who carry banks as part of their job duties states that employees perform banking duties on the clock and there is no requirement that employees perform these duties when they are off the clock.  *See, e.g.*, Aldridge Decl. ¶¶ 7, 17, 18, 19, 20; Ashbaugh Decl. ¶¶ 20, 30, 31, 32, 33; Bausa Decl. ¶ 4; Cooper Decl. ¶¶ 5, 17, 18, 19, 20; Gutierrez Decl. ¶¶ 5, 14, 15, 16, 17, 18; Maddern Decl. ¶¶ 24, 25, 26.

By contrast, Plaintiffs and declarants, claim that "each and every day" they performed banking duties before they clocked in for their shift and after they clocked out after their shift.  *See* Unating Decl.

1    ¶ 9; Levert Decl. ¶ 9; Hill Decl. ¶ 8; Johnson Decl. ¶ 8.[14]  Plaintiffs and declarants claim that they spent

2    approximately 15 minutes off the clock at both the beginning and end of each shift to complete these

3    tasks.  *See id*.  Declarant Johnson further claims that because the employee bank was only open at

4    certain times, she was "often required to come in an hour to an hour-and-a-half prior to [her] regularly

5    scheduled shift just so that [she] could complete these tasks while the bank was open."  Johnson Decl.

6    ¶ 8.  Johnson explains, "[f]or example the bank often closed between 3:30-4:00 p.m.  Because [her]

7    usual shift did not start until 5:00 p.m., [she] would have to come in early to visit the bank before it

8    closed."  *Id*.[15]

9    **D.    Bartending Policies And Practices**

10    TIHLV does not have a company-wide policy or practice requiring bartending employees to

11    perform work such as obtaining keys, setting up, or shutting down the bar while off the clock.  *See*

12    Peterson Decl. ¶ 15;  TIHLV 2010 Associate Handbook, p. 27 ("It is the policy of TIHLV to pay non-

13    exempt associates overtime in accordance with federal, state, and local regulations.");  Aldridge Decl.

14    ¶¶ 4, 8; Bausa Decl. ¶¶ 4, 5, 6; Paul Decl. ¶¶ 4, 6, 21, 22; Gutierrez Decl. ¶¶ 4, 19, 20.

15    TIHLV bartenders state that they never performed work off the clock either before or after their

16    shifts.  For example, Daniel Farias, a bartender declarant, states in his declaration that he "always shut

17    down the bar and cleaned up before [he] clocked out" and because "it's a part of [his] job

18    responsibilities, [he] must do that while [he is] clocked in."  *See* Farias Decl. ¶ 31.  Jillian Travis,

19    another bartender, stated that she "always clocked in before picking up [her] cash."  *See* Travis Decl.

20    ¶ 22.

21

22    [14]    Notably, although declarant Caroline Deketelaere had cash-handling duties and had an assigned bank, she does not

23    assert that she performed banking duties on the clock.  *See* Deketelaere Decl.; Peterson Decl. ¶ 10; Feb. 2012, Cash-Handling
      Agreement signed by Caroline Deketelaere, attached as Ex. 12.

      [15]    Johnson seems to be saying that she could not conduct her banking duties during the 22 hours per day that the

24    cashier was closed—which TIHLV disputes—and therefore was required to arrive to work 1.5 hours early to conduct her
      banking duties when the cashier was open.  Johnson's shift, however, also ended at a time during which the cashier was

25    closed.  Declarant Johnson does not allege that she needed to stay on property *after* her shift to wait until the bank opened to
      reconcile and deposit cash, even though the cashier is also closed after Johnson ends an 8-hour shift at 1:00 a.m.  Johnson

26    does not explain why she was able to perform her banking duties when the bank was closed at the end of her shift, but she
      was unable to perform her banking duties without the bank being open at the beginning of her shift.

27

28
                                                13

1    **II.    Named Plaintiffs' And Opt-In Plaintiffs' Employment At TIHLV**

2          In support of their Motion, Named-Plaintiffs Levert and Unating, submit declarations from four

3    individuals who have filed consents to join this action:  Caroline Deketelaere, Kevin Layug, Janet Hill,

4    and Lorina Johnson. [16]

5          TIHLV employed Caroline Deketelaere in the Front Office department from December 11, 2009

6    until April 29, 2014.  Deketelaere began her employment as an overnight Front Office Agent.  *See*

7    Peterson Decl. ¶ 7.  In March 2011, TIHLV promoted Deketelaere to Assistant Front Office Manager.[17]

8    *See id*.  On January 29, 2012, TIHLV promoted Deketelaere to Hotel Manager.  *See id*. Assistant Front

9    Office Managers and Hotel Managers are exempt, salaried employees.  *See id*. ¶ 9.  Exempt employees

10   are paid a salary for all hours they work and do not record their working time through the Kronos time

11   clock system.[18]  *See id*.

12         TIHLV employed Janet Hill as a front office agent from February 11, 2008 until April 11, 2014.

13   *See* Peterson Decl. ¶ 11.

14         TIHLV employed Kevin Layug in the Guest Services department as a valet from March 17, 2010

15   until April 29, 2014.  *See* Peterson Decl. ¶ 12.  The Guest Services department includes door, valet, and

16   bell employees.  *See* Kennedy Decl. ¶ 3.

17         Since March 5, 2013, TIHLV has employed Lorina Johnson as a bartender and server in the DJT

18   Lounge.  *See* Peterson Decl. ¶ 13.[19]  The hotel has three additional food and beverage establishments at

19   the hotel:  DJT Restaurant, H2eau Bar, and H2eau Restaurant.  *See id*. ¶ 14.

20         Named Plaintiffs do not allege they ever worked as Front Office Agents, Auditors, or

21   Valets/Doormen.  *See* Unating Decl. ¶ 4; Levert Decl. ¶ 4.[20]  Levert and Unating seek to represent a

22   Front Desk class, an Auditor class, and a Valet/Doorman class.  *See* Doc. 19, 9:16-24.

23   ───────────────
[16]      *See* Docs. 4, 8.
24   [17]      Deketelaere erroneously asserts that she became a salaried employee for Trump on or about March 1, 2012.  *See*
     Peterson Decl. ¶ 7; March 25, 2011, memorandum to staff announcing promotion, attached as Exhibit 13.
25   [18]      Because Deketelaere was an exempt manager and exempt employees are not paid on an hourly basis or eligible for
     overtime, she is not a proper opt-in plaintiff to any purported class, nor is she a proper class representative of any purported
26   class.
     [19]      Johnson's declaration states that her employment began in 2012.  Johnson Decl. ¶ 2.  TIHLV's records indicate that
27   TIHLV hired Johnson on March 5, 2013.  Peterson Decl. ¶ 13.

28

1

**LEGAL ANALYSIS**

2

**I.      Plaintiffs Fail To Meet Their Burden To Demonstrate That They Are Similarly Situated To Any Class They Seek To Represent**

3

4       It is plaintiffs' burden to show that they are similarly situated to the opt-in and putative class.

5  *Sperling v. Hoffman-La Roche Inc.*, 118 F.R.D. 392, 406-07 (D. N.J. 1988).  Plaintiffs must satisfy this

6  burden, "by making substantial allegations of . . . [violations], that is, detailed allegations supported by

7  affidavits which successfully engage defendants' affidavits to the contrary."  *Id*.  While plaintiffs'

8  burden is "modest," it is more than "minimal."   *Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227,

9  1236 (S.D. Ala. 2003) (denying conditional certification of a putative class "consisting . . . primarily of

10  persons performing jobs the plaintiffs never have held, [and] who have different responsibilities and

11  different scheduled hours from the plaintiffs and each other who work under different supervisors and

12  each other[.]") Conditional certification "is by no means automatic."  *Colson v. Avnet, Inc.*, 687 F. Supp.

13  2d 914, 925 (D. Ariz. 2010) (denying conditional certification).

14       Although the Ninth Circuit has not prescribed a single rule for the "similarly situated" analysis,

15  in resolving these questions, a majority of courts have adopted the two-tiered approach espoused by

16  *Lusardi v. Lechner*, 855 F.2d 1062, 1074 (3d Cir. 1988).  Under the *Lusardi* model, the first step, or

17  "notice stage," is limited to determining, based on the pleadings and affidavits submitted by the parties,

18  whether a putative class should be conditionally certified and members of the potential class be given

19  notice.  *See Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 467 (N.D. Cal. 2004).  If notice is

20  authorized, then once discovery is largely complete, the court considers, on a motion for decertification,

21  whether a representative action should be allowed.  *See id*.

22       Conditional certification and notice are appropriate only if there are current or former employees

23  who would have the right to join the collective action are similarly situated to the named plaintiffs and

24  whom the named plaintiffs can properly represent.  *See Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d

25  1095, 1102-03 (10th Cir. 2001); *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997).  Both

26

[20]      TIHLV's records confirm that neither Unating nor Levert worked in any position other than bartender.  Peterson Decl. ¶ 6.

27

28

15

the court and the parties have a "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Severtson v. Phillips Beverage Co.* 137 F.R.D. 264, 267 (D. Minn. 1991); *see also D'Anna v. M/A-COM,* 903 F. Supp. 889, 894 (D. Md. 1995) ("[A]n employer should not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense."); *H & R Block, Ltd. v. Housden,* 186 F.R.D. 399, 401 (E.D. Tex. 1999) ("[T]his court is mindful that it, like practicing attorneys, has a responsibility to refrain from stirring up unwarranted litigation."). Plaintiffs fail to meet their burden of proof, even under the applicable lenient standard.

### A.    Plaintiffs Are Not Similarly Situated To The Three Classes Identified In Plaintiffs' Complaint

Plaintiffs seeking conditional certification cannot meet their burden through unsupported assertions of widespread violations. *See Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 990 (C.D. Cal. 2006). "Affiants in support of a motion for conditional certification must be based on the affiant's personal knowledge." *Lewis v. Nevada Prop. I, LLC*, No. 12-cv-01564, 2013 U.S. Dist. LEXIS 8945, *21 (D. Nev. Jan. 22, 2013). Evidence that a handful of employees were not compensated for all the time they worked "is not enough to merit conditional certification of a collective action. Instead, plaintiffs must submit evidence that the *reason* why the employees were not compensated for these tasks is not because of human error or a rogue . . . manager, but because of a corporate decision to ignore [the employer's] published policies and refuse to pay" for certain time worked. *Thompson v. Speedway Superamerica LLC*, No. 08-CV-1107, 2009 U.S. Dist. LEXIS 3816, *6 (D. Minn. Jan. 20, 2009). Plaintiffs "must share more than a common allegation that they were denied overtime or paid below the minimum wage. The class members must put forth a common legal theory upon which each member is entitled to relief." *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002).

Yet here, Plaintiffs seek certification by asserting that they are similarly situated to purported class members based on the allegation that "[a]lthough Defendant accomplished this unlawful practice [or requiring employees to perform work for which they were not compensated] in a variety of ways, the overall policy was uniformly applied to limit the accumulation of overtime hours and work employees off-the-clock [sic]." Pls.' Mot. 6:1-3. If Plaintiffs' vague allegation were sufficient to warrant a

collective action, courts would automatically grant certification in every FLSA case.  Because Plaintiffs fail to provide competent evidence that TIHLV maintained any one of the numerous policies or practices that Plaintiffs claim caused Plaintiffs and purported similarly-situated employees to work off the clock, certification is inappropriate.

### 1.        Plaintiffs Have Not Met Their Burden Regarding Their Alleged Uniform Class

The *single* piece of evidence that Plaintiffs proffer in support of their assertion that TIHLV maintained any one of several off-the-clock policies is insufficient to support a finding that Plaintiffs are similarly situated.  While Plaintiffs assert that TIHLV "memorialized [its] policy [requiring employees to change into and out of their uniforms onsite and off the clock] in various handbooks, manuals, and communications sent to its employees" (Pls.' Mot. 6:22-23), they proffer only one document—the Guest Services Associate Manual—which, on its face, does not apply to either Named Plaintiffs or three out of the four opt-in plaintiffs who submitted declarations in support of Plaintiffs' Motion.  Named Plaintiffs are not similarly situated to Guest Services Associates because Levert and Unating never worked in the three jobs within the Guest Services department.

Even *if* the Named Plaintiffs *had* worked in Guest Services, this manual is not competent evidence to support the allegation of a class-wide policy that required Guest Service employees to change into their uniform on property.  While it is unclear how Plaintiffs Levert and Unating obtained the purported Guest Services Associate Manual, this document was never promulgated by either the Guest Services department or the hotel.[21]  *See* Kennedy Decl. ¶¶ 5-6; Baudreau Decl. ¶¶ 7-9.  A brief examination of the document reveals irregular formatting, missing pages, and references that are not properly included in a Guest Services Associate Manual.  Further, the Guest Services Manager issued a memorandum in July 2010 that recommended Guest Services employees bring their uniform shirts home with them instead of leaving them on property.  As in *Adair*, conditional certification is inappropriate because TIHLV has produced unequivocal evidence that the premise upon which Plaintiffs' allegations

---

[21]        One of the Plaintiffs who submitted evidence in support of Plaintiffs' Motion did work in the Guest Services department.  Interestingly, however, that Plaintiff—Kevin Layug—did not submit the manual nor did he mention the manual in his declaration.

are based are incorrect.  *See Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 U.S. Dist. LEXIS 68942, *12 (E.D. Wis. Sept. 11, 2008).

Certification is not appropriate when evidence relating to plaintiffs' allegations demonstrate that company-wide or class-wide policies or practices do not exist.  When an employer presents evidence that the premise upon which plaintiff's allegations are based is incorrect, courts have held that certification is inappropriate.  *See Adair*, 2008 U.S. Dist. LEXIS 68942 at *12.  A "[c]ourt's responsibility to intervene in the management of [] litigation beg[ins] when the case [i]s filed." *Freeman v. Walmart Stores, Inc.*, 256 F. Supp. 2d 941 (W.D. Ark. 2003).

In *Adair*, "plaintiffs offered an alternative theory of liability" after the employer "responded to plaintiffs' motion for conditional certification with unequivocal evidence that it does not calculate its employees' wages based on the time they are logged onto the phone system." *Adair*, 2008 U.S. Dist. LEXIS 68942 at *12-13 (proffering declarations supported by records demonstrated that facts plaintiffs' relied upon for asserting liability were incorrect).  Plaintiffs in *Adair* contended that their change in theory "really [did] not matter.  Either way, . . . [plaintiffs] were still denied this pay for their pre and post shift work." *Id*. at *13.

When the *Adair* court denied plaintiffs' motion for certification, it noted plaintiffs' glib treatment of their failure to proffer competent evidence.  "[O]f course, it certainly matters whether statements made under oath in a declaration are true.  Plaintiffs' initial failure to accurately set forth the [c]ompany's timekeeping and payment procedures, even [if] inadvertent, warrants concerns over their other allegations." *Id*. *13-14.  The court specifically noted the importance of the "significant difference between the allegation that the Company was using a mechanical timekeeping system that, by its very nature, failed to capture its employees' entire time at work and the allegation by [a few] employees" of their own specific habits and understanding of policies and practices.  *Id*. at *14.  Here, because TIHLV's evidence overwhelmingly refutes Plaintiffs' allegations of widespread policies resulting in off-the-clock work and Plaintiffs' failure to proffer legitimate evidence in support of their claims, it is

appropriate for the Court to intervene in the management of this case and deny Plaintiffs' request for conditional certification.

### 2. Plaintiffs Cannot Meet Their Burden In Light Of TIHLV's Overwhelming Evidence

Plaintiffs' faulty evidence is further undermined because TIHLV's electronic time-stamp data unequivocally refutes Plaintiffs' claims that the company "forced its employees to work off the clock and without compensation for approximately one-and-a-half to two hours of each and every workday that the employees were employed by Trump" (Pls.' Mot. 8:12-14) in addition to the 15 minutes each employee spends changing into his or her uniform (Pls.' Mot. 7:11-20), and the 15 minutes some employees spend performing banking duties. *Id*. 7:25-26. The inherent implausibility of Plaintiffs' allegations in light of TIHLV's data demonstrates that, at a minimum, in the face of this competing evidence, each purported class member's claim requires individual, day-by-day examination and thus, are not similarly situated.

Plaintiff Johnson asserts that she arrives at work up to an hour and a half before her shift began so that she could visit the cashier window while it was open so that she could perform her banking duties. Doc. 19-12, Johnson Decl. ¶ 8. As in *Adair*, however, an allegation by a few employees of their own specific habits and understanding of policies and practices does not meet the similarly-situated standard of conditional certification. *Adair*, 2008 U.S. Dist. LEXIS 68942 at *14. Because the cashier is only open for two hours per day, many—if not most—employees who carry a bank either retrieve or drop off their banks at some point during the 22 hours per day the cashier is closed. Johnson's decision, or even her manager's requirement,[22] that she perform her banking duties so far in advance of her scheduled shift renders her *not* similarly situated to other employees who carry a bank. Presumably, however, if an employee who worked a shift different than Johnson's—one that began between 9:30 and 10:30 a.m. or ended between 3:30 and 4:30 p.m.—that different employee could visit the cashier window while it was open without arriving to work 1.5 hours in advance of his or her start time. Thus,

---

[22] TIHLV does not suggest that Johnson's manager *would* articulate such a requirement as such a practice would be against TIHLV's policies. However, Johnson's declaration does not explain what policy or practice caused her to arrive at work 1.5 hours in advance of her shift to perform banking duties.

any "requirement" that Johnson arrive 1.5 hours before her shift is individual to *her* and the shifts *she* works.  Conditional certification is inappropriate when such individualized factors must be analyzed.

In addition, the electronic data from February 2014 reveals that, of the 15 instances in which Johnson entered the building and clocked into her shift, she clocked in within one minute or less of entering the building on 11 occasions (73% of the time).  *See* Sample Swipe Analysis, p. 5.

The electronic data regarding other Plaintiffs similarly reflects short time periods between when the Plaintiff entered the building and when he or she clocked in to start his or her shift.  Janet Hill and Omar Unating entered and exited the property within 4 minutes of clocking in or clocking out more than 84% of the time in the sample weeks.  *See* Summary of Sample Swipe Analysis.  Between September 2, 2012 and September 29, 2012, data reflects a total of 16 instances in which Levert clocked out punches and exited the building.  *See* Sample Swipe Analysis, p. 1.  Of those 16 instances, there was only one time that Levert spent more than two minutes on property after clocking out at the end of his shift.  *See id*.

Simply put, Plaintiffs' allegations are incredible.  The time-space continuum does not permit an individual to enter a building, spend 15-20 minutes changing into his or her uniform, spend 15 minutes performing banking duties (if applicable), spend an additional 45 to 60 minutes performing work duties and still punch into the time clock within 4 minutes of entering the building.

**B.      Plaintiffs Are Not Similarly Situated To Classes Of Which They Are Not Members**

Named-Plaintiffs Levert and Unating cannot demonstrate that they are similarly situated to members the Front Desk Class, the Audit Class, or the Valet/Doorman Class they seek to represent because neither Levert nor Unating are members of those classes.  Unating and Levert, who worked as bartenders at TIHLV, are the sole named plaintiffs in this action.  Accordingly, Levert and Unating are the representative plaintiffs.[23]  As noted above, it is "not [] proper to conditionally certify an FLSA class

---

[23]      "Like a member of a plaintiff class under rule 23, however, (and in contrast to a plaintiff who joins as a plaintiff under rule 20), the section 216 plaintiff does not formally appear before the court or file a pleading; he simply files his written consent. He is therefore not named in the caption, Fed. R. Civ. P. 10(a), and he would not ordinarily be served with papers filed after he files the written consent."  *Shushan v. Univ. of Colo.*, 132 F.R.D. 263, 264 (D. Col. 1990)).  Named plaintiffs, rather, *represent* opt-in plaintiffs.  *See Bean v. Crocker Nat'l Bank*, 600 F.2d 754, 760 (9th Cir. 1979).

1  that is not predicated on a claim alleged in the Complaint and where the representative plaintiff is not a

2  member of the class for which conditional certification is sought." *Lewis v. Nevada Prop. 1, LLC*, No.

3  12-cv-01564, 2014 U.S. Dist. LEXIS 49068, *16 (D. Nev. Apr. 8, 2014).  When a named-plaintiff does

4  not share the claims of purported class members, he or she "cannot represent the interests of employees

5  who fall within such a class." *Id.*

6          Courts have summarily rejected plaintiffs' attempts to certify a collective action where "plaintiffs

7  seek to certify a collective action consisting largely if not primarily of persons performing jobs the

8  plaintiffs have never held, who have different responsibilities and different scheduled hours from the

9  plaintiffs and each other, who work under different supervisors than and in remote locations from the

10  plaintiffs and each other, and who have allegedly been denied overtime compensation for reasons

11  different than the ones applicable to the plaintiffs and each other." *See Reed*, 246 F. Supp. 2d at 1233.

12          Here, Named Plaintiffs cannot plausibly allege that they fall within the Front Desk Class, the

13  Audit Class, and/or the Valet/Door Class they seek to represent.  Thus, classes that consist of persons

14  performing jobs that Named Plaintiffs never held, who had responsibilities and schedules distinct from

15  Plaintiffs' bartending position, and who worked under different supervisors are inappropriate under even

16  the lenient relevant standards.

17  **II.     Named Plaintiffs' Attempt To Amend Their First Amended Complaint Must Be Rejected**

18          **A.      Named Plaintiffs Cannot Seek Certification Of Classes Not Predicated On Facts Or**
            **Claims Articulated In Plaintiffs' First Amended Complaint**

19

20          Plaintiffs cannot seek certification for classes of employees for whom Plaintiffs have not alleged

21  a violation or injury in their complaint.  It is "not [] proper to conditionally certify an FLSA class that is

22  not predicated on a claim alleged in the Complaint . . ." *Lewis v. Nevada Prop. 1, LLC*, 2014 U.S. Dist.

23  LEXIS 49068, *16.  It is inappropriate for courts to treat a motion for class certification as a *de facto*

24  amendment of the complaint.  *See e.g.*, *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 672,

25  n3, 680 n. 10. (N.D. Ill. 1989).  Only the purported FLSA classes identified by Plaintiffs in their

26  operative Complaint are properly before this Court.  *See Costello v. Chertoff*, 258 F.R.D. 600, 604-605

27

28

(C.D. Cal. 2009) ("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it.").

In *Young v. Beard*, Plaintiff attempted to expand a conditionally-certified class by submitting a declaration of an employee outside of the previously-defined classes. *Young v. Beard*, No. 11-cv-02491, 2014 U.S. Dist. LEXIS 2216, *15 (E.D. Cal. Jan. 8, 2014). The court held that the declaration was not sufficient to support certifying a class of employees at a facility that "[wa]s not one of the facilities plaintiff alleges to be violating law in his . . . operative complaint." *Id*. Because the proposed additional class was beyond the scope of plaintiff's operative complaint, the class was not properly part of the action. *See id*.

Plaintiffs' Complaint identifies a "Uniform Class," "Bank Class," and "Bartending Class." *See* Pls.' FAC, 5:18-26.[24] Plaintiffs' Motion For Notice identifies three classes that Named Plaintiffs seek to represent, but for whom there are *no* claims alleged in the operative Complaint: "Front Desk Class," "Auditor Class," and "Valet/Doorman Class." *See* Pls.' Mot., 9:16-24. But Plaintiffs do not allege facts related to or assert a claim of a company-wide policy or practice by which TIHLV either requires or permits employees to perform off-the-clock work before or after their shift. In their Complaint, Named Plaintiffs allege that it took "approximately 45-minutes each and every day both pre shift [sic]" to "pick up keys and set up their bar (making coffee, getting ice, filling ice wells, juice, fresh fruit, and setting up the pastry station, among other tasks)." Pls.' FAC, 4:16-20. These allegations relate solely to the Named-Plaintiffs' duties as bartenders and, logically, Named-Plaintiffs' defined bartending class. *See* Pls.' FAC, 5:24-26 ("The Bartending Class: All current and former hourly paid employees who, at any time during the relevant time period alleged herein, were required to collect tools and/or set up the bar pre-shift and/or post-shift."). Plaintiffs' Complaint fails to allege that any non-bartender employees performed these duties of making coffee, filling ice wells, or setting up the pastry bar. Indeed, it is

---

[24] Plaintiffs' First Amended Complaint included a "Wages Due and Owing Subclass" and also sought to bring a class action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs have since withdrawn these claims. *See* Pls.' Mot. 9:6-24.

unlikely that the Auditor or Front Desk Classes that Plaintiffs' seek to represent were tasked with making coffee, filling ice wells, or setting up the pastry bar.

Although Plaintiffs' Motion identifies "Plaintiff's [sic] Claim Regarding Additional Off-The-Clock Activities," Plaintiffs' Complaint is completely devoid of claims asserting that TIHLV maintains any company-wide—or even department-wide—policy or practice that requires or permits employees to work off the clock applicable to any non-bartender employees. *Compare* Pls.' Mot., 8:3-15 *with* Pls.' FAC, 4:16-20. Thus, Plaintiffs' proposed Front Desk Class, Auditor Class, and Valet/Door Class are not properly before this Court and therefore should not be certified.

### B. Plaintiffs Attempt To Allege Facts That Constitute An Entirely New Legal Theory

Also included in their Motion—but not in their Complaint—is Plaintiffs' attempt to shoehorn TIHLV's valid timekeeping practice of rounding time punches to the nearest 15 minutes into Plaintiffs' overbroad off-the-clock claims. As noted above, it is "not [] proper to conditionally certify an FLSA class that is not predicated on a claim alleged in the Complaint." *Lewis v. Nevada Prop. 1, LLC*, 2014 U.S. Dist. LEXIS 49068, *16. Plaintiffs take their attempt to amend their complaint a step further by seeking to characterize the rounding practice as time "shaving" instead of rounding in an attempt to obfuscate the fact that the Complaint is devoid of any allegations relating to TIHLV's rounding practices. Just as Plaintiffs' newly-identified classes are not properly before this Court, Plaintiffs' rounding claim—insofar as it relates to any and all purported classes—is not properly before this Court.

### III. Tolling Is Inappropriate In This Case

It is inappropriate for the Court to grant Plaintiffs' request to toll the statute of limitations. The Ninth Circuit recognizes that federal courts apply the doctrine of equitable tolling in two situations: (1) when the plaintiff is prevented from asserting her claims by some kind of wrongful conduct on the part of the defendant; or (2) when extraordinary circumstances beyond plaintiff's control make it impossible to file the claims on time. *See Alvarez-Machain v. U.S.*, 107 F.3d 696, 701 (9th Cir. 1997). There is no suggestion in this case that any wrongful conduct by TIHLV has prevented or dissuaded any potential class member from asserting his or her claims. Nor are there any extraordinary circumstances beyond

1   the control of any potential class members that make it impossible to file such claims in a timely

2   manner.  Accordingly, equitable tolling is not justified.  *See Cranney v. Carriage Servs., Inc*., 559 F.

3   Supp. 2d 1106, 1109 (D. Nev. 2008) (equitable tolling not warranted where plaintiffs failed to show

4   wrongful conduct by defendants or extraordinary circumstances); *Bonilla v. Las Vegas Cigar Co.,* 61 F.

5   Supp. 2d 1129, 1140 (D. Nev. 1999).

6       Here, any delay is Plaintiffs' own doing because of their repeated, unartful pleading and their

7   lack of competent proof that they are similarly situated to classes they seek to represent.  If the Court

8   were to apply equitable tolling here, it would make equitable tolling appropriate in every FLSA

9   collective action.  Such a reading into the doctrine of equitable tolling is directly at odds with the very

10  specific opt-in mechanism that Congress enacted for the FLSA.  Plaintiffs' request for equitable tolling,

11  in effect, asks the Court to re-write the FLSA.  The Court should decline Plaintiffs' invitation.

12  **IV.     If Plaintiffs' Motion Is Granted, The Proposed Notice Must Be Amended**

13      Finally, even if notice were proper in this case – which TIHLV strongly disputes – numerous

14  problems plague Plaintiffs' proposed notice and render the notice wholly inappropriate.  *See* proposed

15  Notice, Doc. 19-1.  The proposed notice contains countless internal errors and inconsistencies, and also

16  includes provisions that are wholly inappropriate and overreaching given the nature of this case.  Due to

17  the sheer number of issues, TIHLV asks that if the Court decides to authorize issuance of notice on any

18  portion of Plaintiffs' claims, the parties be directed to confer and jointly arrive at language that is

19  mutually agreeable.

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For each and all of the foregoing reasons, TIHLV respectfully requests Plaintiffs' Motion be denied in its entirety.

Respectfully submitted this 20th day of October, 2014.

JACKSON LEWIS P.C.


/s/ Elayna J. Youchah
Elayna J. Youchah, Bar No. 5837
Peter Navarro, Bar No. 10187
3800 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

*Attorneys for Defendant Trump Ruffin Tower I, LLC*
*dba Trump International Hotel Las Vegas*

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee Jackson Lewis P.C. and that on this 20th day of October, 2014, I caused to be served a true and correct copy of the above and foregoing **DEFENDANT TRUMP RUFFIN TOWER I, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CIRCULATION OF NOTICE PURSUANT TO 29 U.S.C. § 216(b)** via electronic mail, through the Court's ECF filing system, properly addressed to the following:

Mark R. Thierman
mark@thiermanlaw.com
Joshua Buck
josh@thiermanlaw.com
Leah Jones
leah@thiermanlaw.com
Thierman Law Firm, P.C.
7287 Lakeside Drive
Reno, Nevada 89511

*Attorneys for Plaintiffs*


                                              /s/ Emily Santiago
                               Employee of Jackson Lewis P.C.